# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **JAMES L. COOPER** | **CIVIL ACTION NO. 20-1454** |
| **VERSUS** | **JUDGE: SARAH S. VANCE** |
| **CORNERSTONE CHEMICAL COMPANY** | **MAGISTRATE: MICHAEL B. NORTH** |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff James L. Cooper ("Cooper"), by and through undersigned counsel brings this amended complaint against Defendant Cornerstone Chemical Company ("Cornerstone"), and respectfully alleges, upon knowledge as to himself and his own actions and upon information and belief as to all other matters, as follows:

## NATURE OF THE CASE

1. This is a hybrid action for declaratory, affirmative and equitable relief, as well as other damages, including lost wages and compensatory damages based on Defendant Cornerstone's discharging Plaintiff without just cause, in violation of the Last Chance Agreement and in violation of the law prohibiting age discrimination.

2. Local USW 13-447 breached its duty of fair representation in the handling of the Plaintiff's grievance.

*3.* Plaintiff brings this action based upon Defendant Cornerstone's violation of the Louisiana Employment Discrimination Law ("LEDL") La. R.S. 23 § 301 *et seq.* and the Age Discrimination and Employment Act ("ADEA") 29 U.S.C. 621 *et. seq.*

4. Defendant Cornerstone has discriminated against Plaintiff in the terms,

conditions and privileges of his employment based on his age.

5. United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union Local USW 13-447 ("Local USW 13-447"), has failed to enforce the terms of the collective bargaining agreement and the last chance agreement and has permitted Defendant Cornerstone to disregard the these two contracts at will, without serious complaint or grievance by the union.

6. Plaintiff has suffered, is suffering and will continue to suffer severe economic and non-economic damages, including emotional distress damages, because of Defendant Cornerstone's unlawful conduct and Local USW 13-447's breach of its duty of fair representation.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over the state claims in this action pursuant to 28 U.S.C. §1332 in that it is a civil action between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. This Court has jurisdiction over the federal claims pursuant to 28 U.S.C. §1331 and 1343.

7. Venue is proper because the employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the Eastern District of Louisiana.

## PARTIES

8. At all times relevant herein, Plaintiff was a resident of the Parish of Jefferson, State of Louisiana.

9. At all times relevant herein, Plaintiff was an employee of Defendant Cornerstone and was covered by the collective bargaining agreement ("CBA") between Defendant Cornerstone and Local USW 13-447.

2

10. At all times relevant herein, Plaintiff was an "employee" within the meaning of the LEDL and the ADEA and thus, was afforded protection against age discrimination by Cornerstone.

11. At all times relevant herein, Defendant Cornerstone is a corporation organized and existing under the laws of the State of Delaware with a domicile located at 1209 Orange Street, Wilmington, DE 19801.

12. At all times relevant herein, Defendant Cornerstone was the Plaintiff's "employer" within the meaning of § 302 of the LEDL and § 630(b) of the ADEA.

13. Upon information and belief, the CBA between Defendant Cornerstone and Local USW 13-447 prohibited Defendant Cornerstone from terminating Plaintiff's employment without just cause.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

14. Plaintiff attempted to exhaust all contractual grievance procedures before initiating this suit.

15. On February 3, 2020, Defendant Cornerstone terminated Plaintiff's employment without just cause. Plaintiff asked Local USW 13-447 to file a grievance on his behalf regarding his termination by Defendant Cornerstone. Local USW 13-447 was aware of Plaintiff's grievance, failed to investigate his grievance and failed to pursue his grievance in a reasonable and adequate manner.

16. Accordingly, further attempts to exhaust contractual remedies would be futile.

## FACTS

17. Cornerstone manufactures and distributes chemicals.

18. Cooper worked for Cornerstone and its predecessor companies (American Cyanamid and

Cytec) from April 1, 1991 until he was fired on February 3, 2020, a period of almost three full decades.

19. At the time Cornerstone discharged Cooper, he was 60 years of age.

20. Cooper has worked in the Maintenance Department (later changed in name to Reliability Department) since the early 1990's. He has been a Maintenance Mechanic for approximately the past twenty-five years. He has also been a Crane Operator for approximately the past ten years. During the past ten years Cooper has been performing at both jobs.

21. For the past eight years Cooper has held the Leaderman roles as both a Maintenance Mechanic and a Crane Operator when available based on his seniority.

22. On or about June 23, 2018, Cooper and Cornerstone entered into a Last Chance Agreement. Pursuant to the Last Chance Agreement, Plaintiff and representatives of Defendant agreed that Plaintiff's employment with Defendant would continue under the four following provisions: 1. that Plaintiff will abide by all Cornerstone's policies, procedures and work standards at all times; 2. that Plaintiff will safely and competently perform all aspects of his job; 3. Violations, no matter the severity, will result in the termination of his employment; and 4. Plaintiff's disciplinary record will not be cleared as part of the agreement. Also, Plaintiff agreed that, should he be discharged for an alleged violation of the terms of the Last Chance Agreement, he may not utilize the grievance and arbitration procedure within the CBA.

23. Cooper served as the back-up Crane Operator Leaderman for approximately five weeks in November and December 2019.

24. After biding on it on January 14, 2020, Cooper was awarded the Crane Operator Leaderman position on January 27, 2020. After working in that position for one day, Cooper was suspended on Tuesday, January 28, 2020, and then fired on February 3, 2020.

25. Pursuant to the Last Chance Agreement, Cooper's employment was to continue under the terms and conditions of the Last Chance Agreement.

26. In the fall of 2018, Matt Bordelon (age 30) became the Supervisor of the Maintenance Department. In this position, he was Cooper's immediate supervisor.

27. In the summer of 2019 Cody Dupre (in his 30's) became Cooper's immediate supervisor as the Supervisor of the Machine Shop/Crane Crew.

28. In November 2019, Cooper became the backup Leaderman of the crane operators, when Leaderman Karl Miller was out of work for a medical reason.

29. Backup Leaderman's duties in the absence of the Leaderman are the same as the Leaderman's duties. These duties include verifying and charging the amount of time that each crane operator spent on each of his daily assignments, which the backup Leaderman records in the workorders. The backup Leaderman also tracks the availability of the crane operators during the day so they may be assigned to new jobs that may arise during the day.

30. In the week after Thanksgiving 2019, Shawn Trahan (age 40), crane operator, in a meeting attended by Cooper, Trahan, Dupre, informed Dupre that he (Trahan) refused to take orders from Cooper. Trahan refused to work with Cooper at all. Trahan lost his temper in this meeting and became so loud that Dupre texted to Bordelon requesting that he also attend this meeting.

31. Bordelon and Dupre did not support Cooper in his performance of his duties as backup Leaderman. Instead they allowed the younger Trahan to be insubordinate to Cooper.

32. Further problems arose during this period when Cooper was the backup Leaderman. Trahan would not tell Cooper his whereabouts during the workday. When other managers called Cooper to request a crane, Cooper was unable to tell them if Trahan could assist them.

33. Bordelon heard this matter discussed on the radio and called a meeting in the second week of December 2019 with Trahan and Cooper. In this meeting, Cooper complained to Bordelon that Cooper could not properly do his job without the cooperation of Trahan. Cooper was unable to properly account for Trahan's time and he could not properly assign Trahan to crane duties that might arise during the workday.

34. Again, Bordelon did not support Cooper's authority in this situation and allowed Trahan's insubordination to continue.

35. Miller returned to work as the Leaderman on January 3, 2020.

36. Miller's employment with Cornerstone ended on January 24, 2020.

37. Cooper became the Crane Operator Leaderman on January 27, 2020. On this first day as Crane Operator Leaderman, the Maintenance Department had a job to open, inspect and clean MM 7's primary and secondary condensers at the MMA unit. Part of this job was to remove and lower to the ground for inspection the overhead crossover piping that connected the primary and secondary condensers.

38. At this job Cooper operated the crane while the maintenance crew, Mark Shields, Michael Frederick and Terry Cook, and their supervisor Chad Breaux, were located at the top of the structure, approximately 100 feet above the ground, at the crossover piping.

39. The maintenance crew removed the bolts that connected the piping to the primary condenser.

40. The bolts that connected the piping to the secondary condenser could not be removed by the maintenance crew because it was stuck with polymer. This fact was communicated to Cooper by the maintenance crew by radio because Cooper could not see this from the ground.

41. The secondary flange remained hot bolted to the piping with a flange gap for the cut by

the hydroblasters.

42. The hydroblasters were called in to cut through the polymer so that the piping could be suspended and lowered to the ground for inspection. The maintenance personnel left the work area with the piping hot bolted to the secondary condenser so the hydroblasters could cut the polymer to free the piping from the secondary condenser.

43. The load on the crane, which was about 1500 pounds, remained attached to the condenser and was not suspended.

44. That afternoon Cooper had to leave the job site for a pre-approved dental appointment. Cooper, as Crane Operator Leaderman, called on the radio at approximately 2:00 pm the only other crane operator available, Trahan. After Trahan acknowledged the radio call by saying "Go ahead," Cooper told Trahan that Trahan would be working overtime at MMA. Trahan did not respond to this instruction.

45. Cooper's subsequent attempts to communicate with Trahan by radio failed. Cooper repeatedly tried to call him on the radio to tell Trahan to relieve him at 2:30. Trahan no longer answered Cooper's radio calls after the initial radio call. Because of his appointment commitment, Cooper had to leave the crane unattended at 2:30 to go find Trahan, who was the only other qualified crane operator available.

46. When Cooper left the crane, the mechanics had descended from the structure and went to the break room.

47. When Cooper left the crane, the load was not suspended. It was attached to the secondary condenser.

48. Cooper found Trahan in the machine shop, about a five-minute walk from the crane. He asked Trahan why he didn't answer his radio calls? Trahan did not reply. Cooper again told Trahan

that he needed to go to the crane. Trahan asked if he left the load suspended. Cooper replied, "No its bolted up."

49. Trahan resumed the crane duties approximately 10-15 minutes after Cooper left the crane.

50. Cooper operated the crane safely and competently on January 27, 2020.

51. Cooper committed no safety violations when he operated the crane on January 27, 2020.

52. On January 28, 2020, a meeting was held with Cooper, Matt Bordelon, Cody Dupre, Jim Noone, Walter Eccles, Joe Dazet and Pat Dunham.

53. At the meeting Noone told Cooper that he was suspended for seven days for committing a safety violation by leaving a suspended load hanging.

54. Cooper responded by stating he left the load bolted and not suspended.

55. Bordelon stated that he went to the crane to see if the load was suspended and that he couldn't tell from looking from the ground. He stated that he did not go up on the structure to check to see if the load was suspended. Bordelon also stated that he was getting a statement from the mechanics "as we speak."

56. Dupre stated that he heard the conversations on the radio between Cooper and the maintenance crew.

57. Although Dupre was on the radio and heard that Trahan was not answering Cooper's calls on the radio, he did nothing to support Cooper who was attempting to assign a work duty to a subordinate.

58. After the suspension meeting on January 28, 2020, Dupre called Dazet, union representative for the Reliability Department, and told him that "They are out to get Cooper."

59. On February 3, 2020, Noone called Cooper on the telephone and told him that he was being terminated for violating the Last Chance Agreement.

60. Defendant Cornerstone's purported reason for terminating Plaintiff – violation of the Last Chance Agreement- was false and a pretext for invidious age discrimination.

61. Although this was supposedly a safety violation, Bordelon and Dupre did not follow the company procedure after a safety violation, especially a safety violation that resulted in an employee losing his job.

62. For example, after Cooper's alleged safety violation, there was no stand down of the Reliability Department, which is headed by Bordelon, to discuss the alleged violation.

63. After Cooper's alleged safety violation, there was no safety meeting to discuss the alleged "violation."

64. After Cooper's alleged safety violation, there was no tier 1 meeting to discuss the alleged "violation."

65. After Cooper's alleged safety violation, there was no report made to OSHA.

66. Cooper worked in this plant for 35 years without a safety incident.

67. The mechanics' statements about the events of January 27, 2020 were obtained on February 5, 2020, after Cooper was discharged. The mechanics' statements verified that the load was not suspended.

68. Cooper was replaced as Crane Operator Leaderman by Brice Brassington, approximately 28 years old.

69. Younger employees in the Reliability Department were treated more favorably than the older employees.

70. In the Reliability Department of Cornerstone there is a pattern and practice of. discrimination against older employees.

71. On February 19, 2020, T.J Malone, a maintenance mechanic in the Reliability

Department, committed a safety violation. Malone injured his fingers by committing a safety violation by not following Cornerstone's safety policies and procedures.

72. Malone's safety violation was reported to OSHA as a safety violation.

73. After Malone's safety violation, the entire Reliability Department went into stand down from noon to 3:00 pm for a safety meeting in the auditorium.

74. After Malone's safety violation, there was a tier 1 meeting to discuss the safety violation.

75. At the time of Cooper's discharge and Malone's safety violation, Malone was 38 years of age.

76. Malone was not disciplined for his safety violation.

77. At the time Cornerstone fired Cooper, all of the remaining three crane operators were 40 years of age or younger.

78. Cooper suffered disparate treatment from Cornerstone because younger employees were treated better than he was in the terms, conditions and privileges of employment.

79. Cornerstone suspended and fired Cooper because of his age.

80. Cooper was qualified for his position as Crane Operator Leaderman.

81. Cooper was replaced by Cornerstone by an employee more than 30 years younger than Cooper.

82. Cornerstone allegedly fired Cooper for committing an unsafe act in violation of the Last Chance Agreement. This is false and a pretext for age discrimination.

83. By the above acts, Cornerstone violated paragraph 312 of the LEDL and Section 623 (a) of the ADEA.

84. By the above acts, Cornerstone breached the Last Chance Agreement and the just cause provision of the collective bargaining agreement.

85. Cornerstone discriminated against Cooper with respect to his compensation and the terms, conditions, or privileges of employment because of his age.

86. On or about February 4, 2020, Local USW 13-447's Maintenance Committeeman Dazet presented Cooper's grievance regarding his discharge to Defendant Cornerstone.

87. Cornerstone refused to accept the grievance.

88. Dazet informed Cooper on the same day that Cornerstone refused the grievance. Local USW 13-447 did not pursue Plaintiff's grievance after this date.

89. Local USW 13-447's conduct toward Plaintiff is arbitrary, discriminatory and/or with malice and in bad faith.

90. Plaintiff had a meritorious grievance and Local USW 13-447 was aware of Plaintiff's grievance.

91. Local USW 13-447 has failed to investigate the grievance and has acted arbitrarily in failing to process the grievance.

92. Local USW 13-447 failed in its duty of fair representation to Plaintiff by failing to press Plaintiff's meritorious claims in a reasonable and adequate manner.

93. Local USW 13-447 has caused injury to Plaintiff by denying him the benefits of the CBA, including his right to arbitrate his termination and his right to restoration to the damage of Plaintiff in an amount to be determined at trial.

## FIRST CAUSE OF ACTION

(Violation of § 301 of the LMRA, Breach of Contracts/Breach of Duty of Fair Representation)

94. Plaintiff incorporates by reference and repeats and re-alleges each and every allegation as if more fully set forth herein

95. Local USW 13-447 refused to process Plaintiff's grievance against Defendant

Cornerstone regarding his unlawful termination.

96. Local USW 13-447 breached its duty of fair representation when it refused to arbitrate Plaintiffs termination in violation of the CBA.

97. Local USW 13-447's conduct toward Plaintiff was arbitrary and in bad faith, since Plaintiff presented Local USW 13-447 with sufficient evidence to pursue a grievance on his behalf.

98. Local USW 13-447's refusal to process Plaintiff's grievance through progressive steps or to proceed to arbitration negatively affected Plaintiff in that he was unable to seek representation against Defendant Cornerstone.

99. Defendant Cornerstone terminated Plaintiff's employment on or about February 3, 2020, without just cause in violation of the CBA and in violation of the Last Chance Agreement.

100. As a result of Local USW 13-447's and Defendant Cornerstone's conduct, Plaintiff suffered damages, including past and future lost wages and benefits, past and future compensatory damages.

**SECOND CAUSE OF ACTION**

(Discriminatory Termination Based on Age in Violation of Louisiana Employment Discrimination Law ("LEDL") La. R.S. 23§ 301 *et seq.* and the Age Discrimination in Employment Act "ADEA" 29 U.S.C. 621 *et. seq.)*

101. Plaintiff incorporates by reference and repeats and re-alleges each and every allegation as if more fully set forth herein.

102. Plaintiff gave Defendant Cornerstone notice that he intended to pursue court action on or about April 3, 2020, in compliance with LEDL, § 303 C.

103. In this notice Plaintiff detailed the alleged age discrimination and complied with all

12

requirements of LEDL, § 303 C.

104. Plaintiff filed a charge of discrimination based on age with the EEOC on November 17, 2010.

105. Plaintiff was issued a Notice of Right to Sue (Issued on Request) on February 8, 2021.

106. Defendant Cornerstone violated the LEDL and the ADEA, when it terminated Plaintiff because of his age.

107. Defendant Cornerstone either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA.

108. Plaintiff suffered damages as a result of Defendant Cornerstone's unlawful acts, including past and future lost wages and benefits, past and future compensatory damages, liquidated damages, attorney fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, as a result of the unlawful conduct and actions of Defendant herein alleged, Plaintiff prays for the following relief:

i) A judgment declaring the conduct of Defendant to be in violation of the law as set forth above;

ii) Enter judgment in favor of Plaintiff for such amounts as may be awarded by a jury for past and future loss of wages and benefits, compensatory damages for his emotional suffering, loss of enjoyment of life, and damage to reputation, liquidated damages;

iii) Enter judgment in favor of Plaintiff for legal interest from date of judicial demand until paid;

iv) Award Plaintiff all costs and reasonable attorney fees incurred in connection with this action; and

v) Grant such additional or alternative relief as may appear to this Court to be just and equitable.

### JURY DEMAND

Plaintiff demands a trial by jury on all claims properly triable by a jury.

Dated: New Orleans, Louisiana
March 15, 2021

Respectfully submitted,

/s/Victor R. Farrugia_____
**VICTOR R. FARRUGIA** (#19324)
Farrugia Law Firm, LLC
1340 Poydras Street
Suite 2100
New Orleans, LA 70112
Telephone: (504) 525-0250
Email: vfarrugia@farrugialawfirm.com

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been electronically filed with the Clerk of Court using the CM/ECF system which will send notice of electronic FILING to all counsel of record this this 15th day of March 2021.

/s/ Victor R. Farrugia___
VICTOR R. FARRUGIA