UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JAMES L. COOPER                                CIVIL ACTION

VERSUS                                         NO. 20-1454

CORNERSTONE CHEMICAL                           SECTION "R" (5)
COMPANY


## ORDER AND REASONS


Before the Court is defendant Cornerstone Chemical Company's ("Cornerstone") motion for summary judgment.[1] Plaintiff James Cooper opposes the motion.[2] Because Cornerstone has submitted evidence that it terminated Cooper because of violations of company policy, and because Cooper has failed to raise an issue of fact that Cornerstone's stated reason is pretextual, the Court grants defendant's motion.


## I.    BACKGROUND

This case arises from the termination of a crane operator. Plaintiff, James Cooper, was employed with defendant Cornerstone and its

---

[1]     R. Doc. 33.
[2]     R. Docs. 52 & 58.

predecessors from April 1, 1991 until his termination on February 3, 2020.[3] At the time of his termination, Cooper was sixty years old.[4]  Plaintiff held several different positions throughout his tenure at Cornerstone.  For the last ten years of his employment, plaintiff worked as a crane operator, which required him to operate different types of cranes, "safely lifting and landing loads."[5]  Most recently, Cooper held the role of Crane Operator Leaderman based on his seniority at the plant.[6]   During his employment with Cornerstone, Cooper was a member of the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Services Workers International Union, on behalf of its Local USW 13-447 ("Local USW 13-447").[7]  As part of his membership, plaintiff was covered by a collective bargaining agreement ("CBA") that was negotiated between Local USW 13-447 and Cornerstone.[8]   The CBA provides members with a process for presenting grievances, including wrongful termination.[9]

Plaintiff received three disciplinary write-ups during his tenure at Cornerstone.  First, in April 2007, plaintiff received a disciplinary write-up

---

[3]    R. Doc. ¶ 18.
[4]    *Id.* ¶ 19.
[5]    *Id.* ¶ 20; R. Doc. 33-4 ¶ 4 (Hymel Declaration).
[6]    R. Doc. 33-3 at 23 (Cooper Deposition at 59:1-22).
[7]    R. Doc. 23 ¶ 9.
[8]    *Id.*
[9]    R. Doc. 33-3 at 153-55, 175 (CBA).

and three-day suspension for falsifying timecards.[10]  Second, in March 2018, plaintiff was written up and suspended for seven days pending an investigation and final disposition, after defendant determined that Cooper engaged in a "deliberate misrepresentation or concealment of evidence."[11]  A few months later, plaintiff was written up for damaging a crane, failing to notify his supervisor about the incident, and refusing to submit to a required drug and alcohol screening.[12]  Plaintiff refused to sign the final two write-ups because he "didn't feel guilty"[13] and "didn't agree with the form."[14]

After plaintiff's third write-up, on June 6, 2018, Cornerstone terminated Cooper's employment.[15]  Cornerstone then rescinded Cooper's termination, and issued a  "last chance agreement" ("LCA") in lieu of termination.[16]  Under the LCA, Cooper was permitted to return to work, provided that he satisfied the terms of the agreement.  The LCA required Cooper to abide by all of defendant's "policies, procedures, and work standards at all times," and provided that if Cooper failed to do so, his violation, "no matter the severity," would result in the termination of his

---

[10]    R. Doc. 33-3 at 219 (Suspension Letter, Apr. 18, 2017).
[11]    *Id.* at 221 (Suspension Letter, Mar. 15, 2018).
[12]    *Id.* at 222 (Suspension Letter, May 31, 2018).
[13]    *Id.* at 46 (Cooper Deposition at 95:18-22).
[14]    *Id.* at 50 (Cooper Deposition at 99:8-9).
[15]    *Id.* at 223 (Termination Letter, June 6, 2018).
[16]    R. Doc. 23 ¶ 22.

employment with Cornerstone.[17]  The LCA also required plaintiff to waive his right to grieve any future findings of a violation.[18]  Cooper, Amy Hymel on behalf of defendant, and Gregory Leonard on behalf of the Union, signed the LCA on July 23, 2018.[19]

On January 27, 2020, plaintiff received permission from his direct supervisor to leave the plant early for a dental appointment.[20]  At the time, plaintiff was assigned a job at the MMA unit, one of the units at Cornerstone's plant that is leased to another company, Roehm America LLC.[21]  The job involved the inspection and cleaning of primary and secondary condensers, and required plaintiff, as Crane Operator Leaderman, to lower to the ground an overhead crossover pipe that connected the primary and secondary condensers.[22]  Three members of Roehm America's "maintenance crew," Mark Shields, Michael Frederick, and Terry Cook, and their supervisor, Chad Breaux, were also at the MMA unit working on the condensers.[23]  At 2:00 p.m., Cooper told Shawn Trahan, plaintiff's scheduled relief crane operator,

---

[17]    R. Doc. 33-3 at 225 (LCA).
[18]    *Id.*
[19]    *Id.*
[20]    R. Doc. 23 ¶ 44.
[21]    *Id.* ¶ 37; R. Doc. 52-2 at 1 (Shields Declaration).
[22]    R. Doc. 23 ¶ 37.
[23]    *Id.* ¶ 38.

that he needed Trahan to relieve him before his appointment.[24]  Plaintiff represents that he was unable to reach Trahan after that initial communication.[25]  At 2:30 p.m., the mechanics working at the MMA site decided to take a break.[26]  Before the mechanics left the site, Cooper asked whether the load attached to his crane was "secure."  The mechanics assured him that it was secure because the load had bolts on one side that connected it to the secondary condenser.[27]  Cooper then left the crane unattended and went to the machine shop, about a five-minute walk from the crane, to look for Trahan, who was unresponsive to Cooper's radio messages.[28]

When Cooper arrived at the machine shop, he told Trahan that he had to relieve plaintiff.[29]  In response, Trahan asked plaintiff whether the load attached to the crane was suspended in the air, and plaintiff responded that, because the load was bolted to a secure structure, it was secured, and therefore not suspended.[30]  Trahan called his supervisor, Cody Dupre, to inform him that Cooper had left a crane unattended, with a load suspended

---

[24]    *Id.* ¶ 44.
[25]    *Id.* ¶ 45.
[26]    *Id.* ¶ 46.
[27]    *Id.* ¶¶ 39-47.
[28]    *Id.* ¶¶ 47-48.
[29]    *Id.* ¶ 48.
[30]    *Id.*

in the air, and the engine running.[31]  In turn, Dupre asked Matt Bordelon, to verify whether Cooper had left the crane unattended.[32]  Bordelon testified that he arrived at the MMA before Trahan had relieved plaintiff, and "noticed that the crane was still running, left unattended, and the load was freely suspended."[33]

The following day, Cornerstone held a meeting where it informed plaintiff that he was suspended for seven days for violating defendant's safety policies by leaving a crane unattended, with the engine running, and with the crane's load freely suspended in the air.[34]  On February 3, 2020, Cooper was terminated for these safety violations, per the terms of his LCA.[35]

On May 14, 2020, plaintiff filed a complaint in this Court alleging that Cornerstone violated the Louisiana Employment Discrimination Law ("LEDL"), La. Stat. Ann. §§ 23:301-314, when it fired plaintiff because of his age.[36]  Cooper asserts that defendant's purported reason for his termination—that he violated the company's safety policy and his LCA—was false and a pretext for age discrimination.[37]  Plaintiff also brought a claim

---

[31]    R. Doc. 33-5 at 8 (Bordelon Deposition at 46:2-23).
[32]    *Id.*
[33]    *Id.* at 13 (Bordelon Deposition at 118:2-4).
[34]    R. Doc. 33-2 at 13.
[35]    R. Doc. 33-3 at 239 (LCA); R. Doc. 23 ¶ 59.
[36]    R. Doc. 1 ¶ 104.
[37]    *Id.* ¶ 60.

under section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, alleging that Cornerstone terminated him without just cause in violation of its collective bargaining agreement ("CBA") with Local USW 13-447.[38] He further alleges that Local USW 13-447 refused to process plaintiff's grievance against Cornerstone regarding his unlawful termination and that this refusal was arbitrary and in bad faith.[39]  On March 29, 2021, plaintiff filed an amended complaint reasserting his previous claims, and adding a claim for age-based discrimination under the Age Discrimination in Employment Act of 1967 ("ADEA").[40]  Defendant now moves for summary judgment on all three of plaintiff's claims.[41]  The Court considers the parties' arguments below.

---

[38]   *Id.* ¶¶ 94-100.

[39]   *Id.*  Plaintiff does not name Local USW 13-447 as a party in this case. Regardless, for plaintiff to prevail against his employer, he must "not only show that [his] discharge was contrary to the contract but must also carry the burden of demonstrating a breach of duty by the Union." *See DelCostello v. Int'l Brotherhood of Teamsters*, 462 U.S. 151, 165 (1983) ("The employee may, if he chooses, sue one defendant and not the other; but the case he must prove is the same whether he sues one, the other, or both.").

[40]   R. Doc. 23.

[41]   R. Doc. 33.

## II.   LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).  "When assessing whether a dispute to any material fact exists, [the Court] consider[s] all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."  *Delta & Pine Land Co. v. Nationwide Agribusiness Ins.*, 530 F.3d 395, 398-99 (5th Cir. 2008).  All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."  *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (quoting 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2738 (2d ed. 1983)); *see also Little*, 37 F.3d at 1075.  "No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of

fact to find for the nonmoving party." *EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991) (quoting *Golden Rule Ins. v. Lease*, 755 F. Supp. 948, 951 (D. Colo. 1991)). "[T]he nonmoving party can defeat the motion" by either countering with evidence sufficient to demonstrate the "existence of a genuine dispute of material fact," or by "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for

resolution. *See, e.g., id.*; *Little*, 37 F.3d at 1075 ("Rule 56 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" (quoting *Celotex*, 477 U.S. at 322)).

## III.  DISCUSSION

### A.  Age Discrimination in Employment Act

The ADEA states that "it shall be unlawful for an employer . . . to discharge any individual . . . because of such individual's age." 29 U.S.C. § 623 (a)(1).  In the Fifth Circuit, age discrimination claims are analyzed under the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 378 (5th Cir. 2010).  Under this framework, the plaintiff bears the initial burden of establishing a *prima facie* case of age discrimination.  To establish a *prima facie* case of age discrimination, a plaintiff must show that "(1) he was discharged; (2) he was qualified for the position; (3) he was within the protected class at the time of discharge; and (4) he was either i) replaced by someone outside of the protected class, ii) replaced by someone younger, or iii) otherwise discharged because of his age." *Id.*

Once a plaintiff has established a *prima facie* case of discrimination, the "burden shifts to the employer to produce a legitimate, nondiscriminatory reason for her termination." *Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003). If an employer produces a legitimate, nondiscriminatory reason for termination, the burden then shifts back to the plaintiff, who must produce "substantial evidence that the proffered legitimate nondiscriminatory reason is a pretext for discrimination." *Id.* In doing so, the plaintiff "must rebut each nondiscriminatory reason articulated by the employer." *Id.* (citing *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001)).

Even if pretext is shown, it may be insufficient to establish discrimination "when the record conclusively reveals some other, nondiscriminatory reason for the employer's decision," or "when the plaintiff creates only a weak issue of fact as to whether the employer's reason was untrue, and there was abundant and uncontroverted evidence that no discrimination occurred." *Id.*

Whether judgment as a matter of law is appropriate ultimately turns on "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a

motion for judgment as a matter of law." *Id.* at 579 (citing *Wallace*, 271 F.3d at 220. "Whatever the employer's decisionmaking process, a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993).

In its motion for summary judgment, Cornerstone argues that Cooper cannot establish a *prima facie* case of age discrimination, and that, even if Cooper has established a *prima facie* case, he cannot establish that Cornerstone's stated reason for termination was pretextual.[42]

### 1.  *Cooper's Prima Facie Case*

Plaintiff asserts that he has established a *prima facie* case of age discrimination because "he was qualified for his position, he is in the protected class by being 60 years of age when he was terminated, and he was replaced by [Brice] Brasington, a younger person by 30 years."[43]  Defendant does not dispute that Cooper has met his burden as to the first three elements of his *prima facie* case.  It is the fourth element—whether Cooper was replaced by someone outside of the protected class—that is in dispute.

---

[42]    R. Doc. 33-1 at 1.
[43]    R. Doc. 58-2 at 6.

Specifically, the parties dispute whether Cooper was replaced by Brice Brasington, a twenty-eight-year-old back-up crane operator at the time of plaintiff's termination.[44]  Plaintiff argues that he was replaced by Brasington because he took over plaintiff's title as the Crane Operator Leaderman.[45] Defendant contends that, because it did not hire a new employee to take over plaintiff's duties, and instead redistributed his duties to existing Cornerstone crane operators, plaintiff cannot show that he was replaced by someone younger.[46]  In support of its position, defendant submits a declaration by Amy Hymel,  Cornerstone's Director of Organizational Development and Effectiveness, in which she attests that "Cornerstone did not fill Mr. Cooper's position after his termination," and that, instead, "all three of the remaining [crane] operators, Brice Brasington, Shawn Trahan, and Duane Dempster, took over some of Mr. Cooper's duties following his termination."[47]  In her declaration, Hymel notes that Brasington was "awarded the Crane Operator Leaderman position effective March 9, 2020, as he was the most 'senior qualified' individual."[48]  Defendant contends that the reassignment of duties to the three crane operators and Brasington's taking over the Leaderman

---

44    R. Doc. 33-2 at 14.
45    R. Doc. 58-2 at 7-8.
46    *Id.*
47    R. Doc. 33-4 ¶¶ 2, 7-8.
48    *Id.* ¶ 6.

duties, a position "purely based on seniority at the plant," do not constitute a "replacement" for purposes of establishing a *prima facie* case of age discrimination.[49]

For the purposes of an ADEA claim, "[s]preading the former duties of a terminated employee among the remaining employees does not constitute replacement." *Lilley v. BTM Corp.*, 958 F.2d 746, 752 (6th Cir. 1992); *see also Hardy v. Shell Chem. Co.*, 693 F. Supp. 2d 611, 620 n.25 (E.D. La. 2010) ("When a plaintiff has been terminated and his job duties are reassigned to existing employees who perform plaintiff's duties in addition to continuing to perform their previous duties, the employee has not been replaced for purposes of establishing his prima facie case."). Plaintiff does not dispute this legal principle, but instead argues that defendant is precluded from asserting that Cooper was not replaced by a younger employee because this contradicts defendant's admission in its answer to plaintiff's amended complaint.[50] Plaintiff's amended complaint alleges in paragraph eighty-one

---

[49]   R. Doc. 66 at 3.

[50]   Plaintiff's amended complaint did not include any new factual allegations, and instead included only a new claim that defendant also violated federal age discrimination law, in addition to its state-law counterpart. R. Doc. 21. Accordingly, defendant's response to both plaintiff's original complaint and amended complaint as to whether Cooper was replaced by a younger employee was identical. *Compare* R. Doc. 10 ¶ 81, *with* R. Doc. 24 ¶ 81. Moreover, because plaintiff's amended complaint "only adds allegations" and does not delete

that "Cooper was replaced by Cornerstone by an employee more than 30 years younger than Cooper."[51]  In its answer, Cornerstone made the following admission in response to plaintiff's allegation: "Cornerstone admits that it replaced Cooper with Brice Brasington, who was 28 at the time.  Cornerstone denies the remaining allegations of Paragraph 81."[52]

"Normally, factual assertions in pleadings and pretrial orders are considered to be judicial admissions conclusively binding on the party who made them." *White v. ARCO/Polymers, Inc.*, 720 F.2d 1391, 1396 (5th Cir. 1983).  A judicial admission is conclusive and withdraws a fact from contention.  *Martinez v. Bally's La., Inc.*, 244 F.3d 474, 476-77 (5th Cir. 2001).  Accordingly, a party "may not rebut a judicial admission made in its pleadings with new evidence or testimony." *Giddens v. Cmty. Educ. Ctrs., Inc.*, 540 F. App'x 381, 390 n.3 (5th Cir. 2013) (citing *Davis v. A.G. Edwards & Sons, Inc.*, 823 F.2d 105, 107-08 (5th Cir. 1987)).  To qualify as a judicial admission, a statement must be "deliberate, clear, and unequivocal." *Heritage Bank v. Redcom Labs., Inc.*, 250 F.3d 319, 329 (5th Cir. 2001). Moreover, "for a statement of counsel to qualify as a judicial admission it

---

anything "stated in the prior pleadings, admissions made in the prior pleadings continue to have conclusive effect." *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 601 (5th Cir. 1981).

[51]   R. Doc. 23 ¶ 81.
[52]   R. Doc. 24 ¶ 81.

must be made intentionally as a waiver, releasing the opponent from proof of fact." *United States v. Chavez-Hernandez*, 671 F.3d 494, 501 (5th Cir. 2012).

Here, Cornerstone's answer is a judicial admission.  It is a "deliberate, clear, and unequivocal" admission in defendant's answer to plaintiff's complaint, considered a pleading under Federal Rule of Civil Procedure 7(a),[53] that Cooper was replaced by Brice Brasington.  *Heritage Bank*, 250 F.3d at 329.  Hymel's statement in her declaration that "Cornerstone did not fill Mr. Cooper's position after his termination,"[54] directly conflicts with Cornerstone's earlier admission that it "replaced Cooper with Brice Brasington."[55]  On its motion for summary judgment, defendant is bound by its prior judicial admission, and thus waived any argument that it did not replace Cooper with Brasington.  *See Davis v. A.G. Edwards & Sons, Inc.*, 823 F.2d 105, 107-08 (5th Cir. 1987) (holding that a party was "bound by the admissions in their pleadings" and thus cannot present evidence that contradicts those pleadings for purposes of creating a dispute of material

---

[53]    *See* Fed. R. Civ. P. 7(a) (defining a pleading as: "(1) a complaint; (2) *an answer to a complaint*; (3) an answer to a counterclaim designated as a counterclaim; (4) an answer to a crossclaim; (5) a third-party complaint; (6) an answer to a third-party complaint; and (7) if the court orders one, a reply to an answer" (emphasis added)).

[54]    R. Doc. 33-4 ¶ 8.

[55]    R. Doc. 24 ¶ 81.

16

fact).    Accordingly, defendant's admission that it replaced Cooper with Brasington, who was twenty-eight at the time, is sufficient for plaintiff to make out a *prima facie* showing that he was replaced by a younger employee. Therefore, Cooper has established his *prima facie* case.

### 2. *Legitimate, Nondiscriminatory Reason*

Because plaintiff has established a *prima facie* case, the burden of production shifts to Cornerstone to provide a legitimate, nondiscriminatory reason for plaintiff's termination.  Here, Cornerstone has produced evidence that Cooper was terminated because of his January 27, 2020 violation of defendant's safety policy, which in turn violated his LCA.[56]  The termination letter tendered by defendant sets forth the reasons for plaintiff's termination:

> [Defendant's] investigation into the events of January 27, 2020 has revealed the following:
>
> - You left the crane unattended with a load of approximately 3000 pounds suspended in the air;
>
> - You did not engage the services of a competent person to determine if your decision to leave the area was safe;
>
> - You left the crane's engine running; and
>
> - You did not enable the crane's swing brake when you left the scene.

---

[56]    R. Doc. 33-3 at 224-25 (LCA) ("Compliance with all of Cornerstone Chemical Company's policies and procedures is a requirement of my employment.").

> In addition to violat[ing] Frontier Reliability Practice 10006 (FRP-1006), this action constituted violations of OSHA Standards Section 1926, 1418(e)(1)[57] and its subsections.[58]

Cornerstone also produced its safety guidelines, specifically section 1006 of its "Frontier Reliability Practice" ("FRP"). FRP section 1006 requires that, before a Cornerstone crane operator leaves a crane "unattended," he must do the following: "land load, set travel, swing, and boom brakes, and shutdown engine."[59] In support of its position that plaintiff was terminated for safety violations under his LCA, defendant also produced its investigative file of the January 27, 2020 incident,[60] and deposition testimony from plaintiff,[61] and its corporate representatives, Matt Bordelon,[62] and Amy Hymel,[63] both of whom were involved in the decision to discharge Cooper. Defendant specifically points to Cooper's own admission in his deposition that he left the crane's engine running,[64] and Bordelon's deposition testimony that, between the time Cooper left and Trahan arrived, he saw that "the crane was

---

[57] *See* 29 C.F.R. § 1926.1417(e) ("*Leaving the equipment unattended . . . .* (e)(1) The operator must not leave the controls while the load is suspended, except where all of the following are met . . . . .").

[58] R. Doc. 33-3 at 239 (Termination Letter, Feb. 3, 2020).

[59] *Id.* at 231 (FRP § 6.1.20).

[60] R. Doc. 33-5 at 7 (Bordelon Deposition at 38:3-6); R. Doc. 33-5 at 19-26 (Investigative File).

[61] R. Doc. 33-3 at 1-112 (Cooper Deposition).

[62] R. Doc. 33-5 at 1-18 (Bordelon Deposition).

[63] R. Doc. 33-6 at 1-12 (Hymel Deposition).

[64] R. Doc. 33-3 at 76 (Cooper Deposition at 130:3-5).

18

still running, left unattended, and [that] the load was freely suspended,"[65] as evidence that defendant violated FRP section 1006.

Plaintiff does not dispute that Cornerstone has offered a legitimate, nondiscriminatory reason for his termination.[66]  Plaintiff instead asserts that defendant's reason is a pretext for discrimination.

### 3. *Pretext*

Because defendant has produced a legitimate, nondiscriminatory, reason for Cooper's termination, plaintiff must show that there is a genuine issue of material fact that Cornerstone's reason for terminating him is pretextual.  As to one of defendant's proffered legitimate reasons, plaintiff does not even contend that the reason was pretextual.  Specifically, Cornerstone explained in Cooper's termination letter that he was discharged based on the results of Cornerstone's investigation, which found that he: (1) left the crane unattended with a load suspended in the air, (2) left the crane's engine running, and (3) did not enable the crane's swing brake, all of which are in violation of its safety policy, FRP section 10006.[67]  Although plaintiff

---

[65]  R. Doc. 33-5 at 13 (Bordelon Deposition at 118:2-14).

[66]  *See* R. Doc. 58-2 at 6 (stating that "defendant satisfied its burden of production by stating the reason for [plaintiff's] discharge as committing an unsafe act in operating his crane on January 27, 2020").

[67]  R. Doc. 33-3 at 239 (Termination Letter, Feb. 3, 2020).

disputes that he left the load suspended[68] and did not enable the swing

brake,[69] he admitted in his deposition that he left the crane's engine running,

in violation of Cornerstone's safety policy.[70]  In his deposition, plaintiff

testified as follows:

> Q. I want to show you that particular policy [FRP-1006
> Reliability Safe Work Practice Mobile Crane] . . . . Section 6.1.20
> says, "Before leaving crane unattended, land load, set travel,
> swing and boom brakes, and shutdown engine."
>
> . . . .
>
> Q. Did you receive a copy of [FRP-1006] during your
> employment?
>
> A. I'm familiar with it.
>
> Q. Okay.  Is this something that you understood was safety
> practices that you were responsible . . . for complying with[?]
>
> A. Well, everybody is.
>
> . . . .
>
> Q. Well, with respect to the FRP, we just walked through that
> together.  And in that section it said that you needed to turn the
> engine off.  But you didn't do that here, correct?
>
> A. That's correct.
>
> Q. And wouldn't that be a violation of FRP-1006?

---

[68]    R. Doc. 33-3 at 75 (Cooper Deposition at 129:2-14).

[69]    *Id.* at 76 (Cooper Deposition at 130:6-12).

[70]    *Id.* at 76 (Cooper Deposition at 130:2-4).

A. Well, everybody violated that.  We never turned the engine off.
Ever.  Like I said before, only during lunch or at the end of a
shift.[71]

In his opposition, Cooper does not address defendant's assertion that
he was terminated because he violated its policy by leaving the engine
running on an unattended crane.  More critically, plaintiff offers no reason
why defendant's decision to terminate him for this undisputed violation was
pretextual.  The Court therefore finds that Cooper has failed to "present facts
to rebut each and every legitimate, non-discriminatory reason advanced by
[Cornerstone] in order to survive summary judgment." *Wallace v. Methodist
Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001) (quoting *Clay v. Holy Cross
Hosp.*, 253 F.3d 1000, 10007 (7th Cir. 2001)); *see also Adreani v. First
Colonial Bankshares Corp.*, 154 F.3d 389, 399 (7th Cir. 1998) ("[T]he
existence of a genuine issue of triable fact with respect to some of the reasons
for discharge proffered by the employer is of no consequence as long as at
least one reason is uncontested.").

Instead, plaintiff submits two arguments to show that defendant's
purported justification is pretextual.  First, he argues that the January 27,
2020 incident was "not an unsafe operation of a crane" because he did not

---

[71]    *Id.* at 67, 69, 76-77 (Cooper Deposition at 118:15-17, 121:7-22, 130:2-131:9).

leave the load suspended, and therefore did not violate FRP section 1006 and OSHA standards section 1926.1417(e)(1).[72]   Second, plaintiff disputes that defendant conducted a thorough investigation to determine whether he committed a safety violation.[73]   The Court addresses each argument in turn.

Cooper first argues that his operation of the crane on January 27, 2020 was not unsafe, and that, if he can show that "there is no safety violation[,] the company's reason for termination is false."[74]   To support this contention, Cooper relies on his expert, Thadeus Dantin's opinion that "[i]t is not a safety violation to leave a crane unattended for a short period of time if the load remains attached to a structure and is not suspended."[75]   He also relies on a declaration from Mark Shields, a maintenance mechanic at Roehm America, who was working on a different aspect of the MMA condenser job on January 27, 2020.[76]   In his declaration, Shields states that on the day in question, he "did not observe any safety violations during [the] job."[77]   He additionally states that, before the mechanics left on break that day, they inserted four

---

[72]   *Id.* at 4, 8-9.
[73]   *Id.* at 9-11.
[74]   *Id.* at 8.
[75]   *Id.* at 2.
[76]   R. Doc. 52-2 ¶¶ 3-7 (Shields Declaration).
[77]   *Id.* ¶ 24.  Notably, Shields, and the other mechanics "were not managed by Cornerstone under its safety policies and procedures."  R. Doc. 33-4 at 1-2 (Hymel Declaration).

temporary bolts to secure one side of the crossover pipe to the secondary condenser, which meant that the pipe—the crane's load—was not suspended.[78]  He also noted that the bolts were not removed until Trahan had replaced Cooper in the crane.[79]

Cooper asserts that Shields's declaration creates an issue of fact as to whether the load was suspended.[80]  He also argues that this issue of fact is sufficient evidence that Cornerstone's stated reason for his termination, *i.e.* leaving a suspended load unsupervised, was pretextual.

But even if Cooper is correct that he created an issue of fact whether the load was suspended, this would not create a genuine issue of material fact as to whether Cornerstone's stated reason is pretextual.  *See Bienkowski v. Am. Airlines, Inc.*, 851 F.2d 1503, 1508 (5th Cir. 1988).  The ADEA "was not intended to be a vehicle for judicial second-guessing of employment decisions, . . . [and] cannot protect older employees from erroneous or even arbitrary personnel decisions."  *Id.* at 1507-08; *see also Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991) ("Even an incorrect belief that an

---

[78]    R. Doc. 52-2 ¶¶ 10, 19 (Shields Declaration).

[79]    *Id.* ¶ 17.

[80]    Bordelon, Cornerstone's Maintenance Superintendent, testified that the company instructed its crane operators not to leave a load suspended, which Cornerstone defined as a hanging load that was not fully attached and bolted down on both sides to a secure structure.  R. Doc. 52-11 at 2 (Bordelon Deposition at 21:2-25).

employee's performance is inadequate constitutes a legitimate, non-discriminatory reason."). Cooper's evidence that he did not leave the load suspended is insufficient because he "must, instead, produce evidence demonstrating that [Cornerstone] did not in good faith believe these allegations, but relied on them in a bad faith pretext to discriminate against him *on the basis of his age*." *Waggoner v. City of Garland*, 987 F.2d 1160, 1166 (5th Cir. 1993). Plaintiff has produced no such evidence here.

Second, Cooper contends that defendant's reason for his termination was false and pretextual because Cornerstone did not conduct a thorough investigation as to whether Cooper left the load suspended.[81] Cooper asserts that Cornerstone's investigation was inadequate because the investigation was still ongoing when plaintiff was terminated. Specifically, Cooper notes that Cornerstone terminated him before obtaining written witness statements from three Roehm mechanics, Mark Shields, Mark Frederick, and Terry Cook, who were working at the MMA site on January 27.[82] Plaintiff argues that the statements by Shields, Frederick, and Cook provide evidence that defendant's explanation was pretextual, because the

---

[81]   R. Doc. 58-2 at 9.
[82]   *Id.* at 9-10.

mechanics' statements "all confirmed that the crossover piping was bolted to the structure."[83]

Plaintiff's assertion that the defendant did not conduct a thorough investigation into whether he left the load suspended is insufficient to create a genuine issue of material fact that Cornerstone's justification for his termination is either false or unworthy of credence. "[E]vidence that the employer's investigation merely came to an incorrect conclusion does not establish a [discriminatory] motivation behind an adverse employment decision." *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005). This is because "[m]angement does not have to make proper decisions, only non-discriminatory ones." *Id.* (citing *Little v. Republic Refining Co.*, 924 F.2d 93, 97 (5th Cir. 1991)). Here, the mechanics' statements that were not included in the investigation prior to plaintiff's termination support plaintiff's contention that the crane had bolts securing the load on one side when plaintiff left it unattended. But, even if the investigation came to the incorrect conclusion that plaintiff left the load suspended, that is still insufficient to create a triable issue of fact as to whether Cornerstone discharged him because of his age. *See Little*, 851 F.2d at 1508 ("Even an incorrect belief that an employee's performance is

---

[83]    *Id.*

inadequate constitutes a legitimate, non-discriminatory reason.").  There is nothing in the mechanics' statements to suggest that defendant's decision to terminate Cooper was based on a discriminatory motive, as opposed to its good-faith belief that he violated the company's safety policy on January 27, 2020.  Moreover, plaintiff's allegation that the investigation was insufficient as to the issue of the suspended load does nothing to undermine the investigation's finding that plaintiff left the crane's engine running, an issue not addressed by the witness statements.[84]

In sum, Cooper has failed to introduce sufficient evidence of pretext to preclude summary judgment.  Summary judgment is therefore granted in favor of Cornerstone on Cooper's ADEA claim.

### B.    Louisiana Employment Discrimination Law

Defendant also moves for summary judgment on plaintiff's LEDL claim.[85]  The LEDL prohibits "discriminat[ion] against any individual . . . because of the individual's age."  La. R.S. 23:312.  With respect to claims of age discrimination, the LEDL is modeled after federal law, and "should be construed in light of federal precedent."  *See, e.g.*, *O'Boyle v. La. Tech Univ.*,

---

[84]    R. Doc. 52-4 at 5-8 (Shields, Frederick, and Cook's Written Statements).

[85]    R. Doc. 33-1 at 8-17.

26

741 So. 2d 1289, 1290 (La. App. 2 Cir. 1999).  Accordingly, Louisiana courts apply the same *McDonnell Douglas* burden-shifting framework when analyzing claims of age discrimination under Louisiana law.  *See Taylor v. Oakbourne Country Club*, 663 So. 2d 397, 383-83 (La. App. 3 Cir. 1995). Because plaintiff alleges the same set of facts in support of both his ADEA claim and his LEDL claim, for the reasons explained above, defendant is also entitled to summary judgment on plaintiff's LEDL claim for age discrimination.

### C.    Labor Management Relations Act

Cooper also brought a claim under section 301 of the LMRA, alleging a breach of contract by Cornerstone and a breach of the duty of fair representation by Local USW 137-447.[86]  Section 301 provides an employee with a federal cause of action against his employer for breach of a collective bargaining agreement, as well as a cause of action against a union for breach of the duty of fair representation that is implied under section 301.  *Bache v. Am. Tel. & Tel.*, 840 F.2d 283, 287 (5th Cir. 1988).  "Because of the intricate relationship between the duty of fair representation and the enforcement of a collectively bargained contract, the two causes of action have become 'inextricably interdependent' and known as a 'hybrid § 301/fair

---

[86]    R. Doc. 23 ¶¶ 94-100.

representation' suit." *Id.* at 287-88 (citing *DelCostello v. Int'l Brotherhood of Teamsters*, 462 U.S. 151, 164-65 (1983)).

A plaintiff bringing a hybrid breach of contract and fair-representation claim "must prove *both* that the employer violated the CBA and that the union breached its duty." *Jaubert v. Ohmstede, Ltd.*, 574 F. App'x 498, 501 (5th Cir. 2014) (citing *DelCostello*, 462 U.S. at 164-65). Plaintiff's "fair representation claim against the union" is considered an "indispensable predicate for a § 301 action." *Daigle v. Gulf State Utils. Co.*, 794 F.2d 974, 977 (5th Cir. 1986) (internal quotation marks omitted). Accordingly, Cooper "must prevail upon his unfair representation claim before he may even litigate the merits of his § 301 claim against the employer." *United Parcel Serv., Inc. v. Mitchell*, 451 U.S. 56, 67 (1981) (Stewart, J., concurring); *see also Jaubert*, 574 F. App'x at 501 ("If [the union] did not breach its duty, we need not consider whether [the employer] breached the CBA.").

A union has a duty to represent employees fairly in enforcing a collective bargaining agreement. *Landry v. The Cooper/T. Smith Stevedoring Co.*, 880 F.2d 846, 852 (5th Cir. 1989). But, within its duty of fair representation, a union also "retains considerable discretion . . . in processing the grievances of its members." *Id.* This is because an employee "has no absolute right to have his grievance taken to arbitration" or to "any

28

other level of the grievance process." *Id.* (citing *Turner v. Air Transport Dispatchers Assoc.*, 468 F.2d 297, 299 (5th Cir. 1972)).  Therefore, a union breaches its duty of fair representation "only when the union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 190 (1967).  A union's actions are considered arbitrary "if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' . . . as to be irrational." *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991) (quoting *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953)); *see also O'Neill*, 499 U.S. at 78 ("Any substantive examination of a union's performance, therefore, must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities.").  And a union's conduct is considered bad faith if plaintiff can provide "substantial evidence of fraud, deceitful action or misconduct conduct." *Amalgamated Ass'n of St. Elec. Ry. & Motor Coach Emp. of Am. v. Lockridge*, 403 U.S. 274, 300 (1971).

Here, Cooper alleges that Local USW 13-447 acted arbitrarily and in bad faith[87] by failing to "process his grievance through progressive steps or

---

[87]   Plaintiff does not assert in his complaint that Local USW 13-447's conduct toward him was discriminatory.  He also testified that he did

to proceed to arbitration."[88]   He specifically asserts that, after his termination, the union never filed a grievance on his behalf.[89]   Yet, in plaintiff's deposition, he concedes that the union did submit to Cornerstone a grievance filed by union representative, Joseph Dazet, on plaintiff's behalf.[90]   Dazet's grievance on plaintiff's behalf is dated February 3, 2020, the day of plaintiff's termination.[91]   This is confirmed by Hymel's 30(b)(6) testimony that Cornerstone received the grievance regarding Cooper's discharge, but that it "refuse[d] to accept the grievance" because the terms of Cooper's LCA expressly waived his right to challenge his termination through the grievance process.[92]   Thus, as a factual matter, plaintiff's assertion as to the union's inaction is contradicted by the record.

Moreover, even if the union did refuse to pursue the grievance and arbitration process on plaintiff's behalf, plaintiff has failed to show that it did so arbitrarily or in bad faith.  Notably, Cooper does not have an "absolute right" to have his termination go through all the stages of the grievance and

---

not have any evidence that the union's action was discriminatory. R. Doc. 33-3 at 90 (Cooper Deposition at 155:16-24).

[88]   R. Doc. 23 ¶¶ 96-98.

[89]   R. Doc. 58-2 at 11-12.

[90]   R. Doc. 33-3 at 91 (Cooper Deposition 158:10-18).  Plaintiff submits the grievance filed on his behalf as an exhibit to his opposition to summary judgment.  *See* R. Doc. 52-9 at 1-2 (Grievance Report).

[91]   R. Doc. 52-9 at 1 (Grievance Report).

[92]   R. Doc. 33-6 at 6 (Hymel Deposition at 49:3-20).

arbitration process. *Turner*, 468 F.2d at 299. And there is no evidence that the union's decision not to pursue his grievance to successive stages was far outside the "wide range of reasonableness," *O'Neill*, 499 U.S. at 67, given that the LCA, signed by Cooper, the Union, and defendant, foreclosed any possibility of challenging Cooper's termination through the grievance process. The LCA expressly states that: "James Cooper, Cornerstone Chemical Company, and the Union agree that should James Cooper be discharged by Cornerstone Chemical Company for an alleged violation of the terms of his Last Chance Agreement, James Cooper my not utilize the grievance and arbitration procedure within the Collective Bargaining Agreement."[93] Similarly, Cooper's termination letter noted that, "per [Cooper's] 'Last and Final Chance Agreement,' this matter is not subject to the grievance and arbitration procedure within the collective bargaining agreement."[94]

In light of the terms of the LCA, the union was well within its discretion not to pursue Cooper's grievance. *See Jacobs v. Georgia-Pac. W. Inc.*, 144 F. App'x 608, 609 (9th Cir. 2005) (holding that because the union "decided that the terms of the Last Chance Agreement eliminated the possibility of

---

93    R. Doc. 33-3 at 225 (LCA).
94    *Id.* at 239 (Termination Letter, Feb. 3, 2020).

filing a grievance, there was no need for the union to thoroughly investigate the complaints or to seek out [plaintiff's] version of events"); *see also Turner*, 468 F.2d at 300 (stating that it is within a union's "broad discretion" to "refuse to initiate the first steps in [an] appeal procedure when it believes the grievance to be without merit"). Thus, because the Court finds that plaintiff has not demonstrated that Local USW 13-447 breached its duty of fair representation, an essential element of his section 301 claim, defendant is entitled to summary judgment on plaintiff's LMRA breach-of-contract and breach-of-duty-of-fair-representation claims.

## IV.   CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is GRANTED.  Plaintiff's complaint is DISMISSED WITH PREJUDICE.

New Orleans, Louisiana, this __3rd__ day of January, 2022.

_Sarah Vance_
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE